L. MEISENHELDER v. H. E. BYRAM AND OTHERS.[1]

November 8, 1929.

No. 27,515.

*Tautges, Wilder & McDonald,* for appellant.

*F. W. Root, C. O. Newcomb, A. C. Erdall* and *Webber, George & Owen,* for respondents.

WILSON, C. J.

Plaintiff appealed from a judgment entered pursuant to an order granting defendants' motion for judgment notwithstanding a verdict for $21,500.

Plaintiff's decedent, Glen G. McGill, was a head brakeman on one of defendants' freight trains. At Fairfax, Iowa, as it came to a stop, he uncoupled the train between the second and third cars. Perhaps this was done before the train came to a standstill. It

[1]Reported in 227 N. W. 426.

was unknown to the engineer. A very few moments thereafter the engineer backed the front part of the train, and Mr. McGill was caught by the couplers between the second and third cars and fatally injured.

The action is based upon the federal safety appliance act, and the claim is that the coupler was defective. The train was engaged in interstate commerce.

■ Plaintiff's case rests largely upon the testimony of Ben Miller. He states that before McGill went in between the cars the front part of the train was backed into the front end of the third car and that the coupler did not automatically couple, that the front portion of the train then advanced eight or ten feet and McGill went to the center of the tracks immediately in front of the third car at or near the coupler, and while there he was killed as stated. All other witnesses, and there are several, state that there was but one train movement—that resulting in the injury—and that there was no prior futile effort to make the coupling.

Miller also testified that after the accident he went to the opening between the second and third cars and found the knuckle on the coupler on the third car opened. He says he shoved on the coupler pretty hard but that he was unable to close it. He also states that the engineer, who came to McGill immediately after the accident, asked McGill why he went in there and that McGill responded that there was "something wrong with the coupling."

All witnesses present state that Miller did not so examine the coupler and did not hear any such statement from Mr. McGill; but for the present purposes we will assume that the jury accepted Miller's statements.

It is a matter well known in the railroad service that automatic couplers do not always couple under all circumstances. They are supposed automatically to couple by impact, but a single failure to do so under all circumstances does not establish a defective coupler. They should so couple when operated and an ordinary and reasonable effort is made therefor. Burho v. M. & St. L. R. Co. 121 Minn. 326, 141 N. W. 300; Popplar v. M. St. P. & S. S. M. Ry. Co. 121

Minn. 413, 141 N. W. 798, Ann. Cas. 1914D, 383; Davis v. M. & St. L. R. Co. 134 Minn. 369, 159 N. W. 802; 45 USCA, § 2, note 50, p. 28. There is nothing on the record to show that McGill's so-called first movement of this train was of such character as would ordinarily result in a coupling. There is no description of the movement, other than Miller's indefinite assertion that it was "pretty hard." All persons present, other than Miller, deny the existence of the movement.

Miller was a section man. He had no technical knowledge relating to couplers. He was apparently subnormal intellectually. He could not read or write. He has never been a train man or a car repairer. His testimony discloses gross ignorance as to cars and their equipment. He did not see or know anything about the position of the couplers before the accident. He was not in a position where he could see them. He did not know the purpose of the movement which he said was made. His observations are practically without significance. He says he "heard somebody fooling with the coupling." This is a conclusion that proves nothing. He knew of the presence of McGill between the cars only by seeing a man's feet when looking under the train. If McGill made a noise, such noise might have resulted from a manipulation or handling of the air apparatus or of the train coupler apparatus. It is possible that McGill so forgot his own safety as to manipulate the coupler with his hands or do some unknown thing thereabouts, but that does not prove or permit the inference that the apparatus was defective.

The so-called examination which Miller claims to have made is of little consequence. The mere fact that his shoving was without results proves nothing. A straight pushing or a straight knock upon the extreme end of the projecting coupler would not cause it to operate. An inexperienced man cannot make a reliable test of such a coupler by doing what Miller says he did. Miller was not qualified to say whether the coupler was defective. His testimony will not permit inferences to that effect. His inability to operate it may have been due to his own ignorance in relation to it and its operations. A coupler is not made to be operated by hand, although

it may in a measure be manipulated by one who understands its construction and mode of operation. The statement that there was "something wrong with the coupling" is extremely general and upon the entire record, in the face of things hereinafter mentioned, falls short of proving or permitting a reasonable inference that there was a defective coupler. The car was equipped with a car coupling device and an air coupling device. These couplings are near each other. McGill may have referred to the air coupling, as some of the testimony hereinafter mentioned indicates. If so, he apparently would have to go in between the cars. If not, he would naturally have used the lever and adjusted the train coupling device attached to the car where he could do it with safety. McGill made no effort to use this appliance.

In order to do the train work involved the immediate thing was to move the train back a few feet. The movement then was to cut the train between the first and second cars from the engine, and the engine and first car were to go ahead (east) on the main track and then back in on the house track, to the south of the main track, couple the first car onto a car on the house track, then pull these two cars out onto the main line and back west on the main line and couple onto the first car there, which was the second car in the train. Then, if coupled, the cars were to be uncoupled between the cars originally the second and third cars of the train and travel east again and back west on the house track, setting out the then second and third cars from the engine. Then the engine and first car would go back to the train on the main track, the natural result being the removal of the second car of the train and putting it in west of the one car already on the house track.

The engineer did not know the movements to be made. He was operating under McGill's signals. He did not know the train had been separated. As the separation was about eight feet, McGill, standing on the south side of the train, where the engineer could see him, gave a back-up signal. The engineer necessarily put his head inside the cab and because of being headed on a down grade slacked ahead a foot or two properly to back up, which he proceeded

to and did do. While this was being done McGill stepped into the place of danger, and the engineer obeyed the signal with the unfortunate result.

Mrs. Alice Dvorak lived just south of the railroad tracks. She stood at her window 200 feet away and saw McGill between the cars eight or ten feet apart. She says he was in the middle of the track, and "it seemed like he was working on something on the other side of the car; I couldn't tell." She says she thought "he was working on something north of the coupler." If so it was probably the angle cock on the air hose. There is some evidence that it may have been a little open and air was making a hissing noise in leaking and was blowing down and the snow and dirt were being blown up at the east end of the third car. This ceased when McGill was in the place of danger. This indicated that he had adjusted the leak. This noise and air escaping would occur if McGill failed completely to close the angle cock on the east end of the third car when he separated the train. Under all the circumstances, it would seem more probable that McGill at the time he was injured was concerned with the angle cock on the air hose rather than the car coupling.

An examination of the car coupling immediately subsequent to the accident showed that it was in good physical condition and that it operated perfectly. The few physical facts involved strongly refute the inferences sought to be drawn from Miller's testimony, which is not strengthened by his rather unusual career. Plaintiff's claim rests in the field of conjecture and speculation. Stemper v. C. M. & St. P. Ry. Co. 167 Minn. 379, 209 N. W. 265; 4 Dunnell, Minn. Dig. (2 ed.) § 7047. Not only is the evidence conjectural and speculative, but it is simply insufficient to prove the existence of a defective coupler. Being so insufficient the verdict could not be sustained. We need not now consider the very serious question of proximate cause as presented by the briefs.

■ This action was commenced in February, 1927. The accident happened November 27, 1926. It was tried in May, 1927. A new trial was granted, and the second trial was in May, 1928. In January, 1929, the trial court granted the motion for judgment notwith-

standing the verdict. In March, 1929, plaintiff moved the court for an order vacating the last mentioned order and granting to plaintiff a new trial and giving plaintiff permission to amend the complaint so as to embrace a cause of action under the federal employers liability act, which requires actions thereunder to be brought within two years from the date of the accrual of the cause of action. A denial of this motion is assigned as error.

This application was late. Plaintiff knew all the facts long before making the application. Judgment had been ordered against her. The showing was weak from the standpoint of merit. The procedure is novel in so far as seeking a new trial is concerned. If the order for judgment was vacated, plaintiff had a verdict and did not need a new trial. Perhaps the application should be considered from the standpoint of a request for an amendment only. But until the order for judgment was vacated and a new trial legally procurred the amendment was too late as a matter of law. But that aside and assuming that the two-year limitation was not a bar, the application rested in judicial discretion, and we are of the opinion that the court wisely exercised its discretion in denying the application.

Affirmed.